In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00148-CV


______________________________




BROWN & ROOT, INC., N/K/A 


KELLOGG-BROWN & ROOT, INC., Appellant


V.



NANCY MOORE, INDIVIDUALLY AND AS PERSONAL


REPRESENTATIVE OF THE HEIRS AND 

ESTATE OF ROBERT MOORE, DECEASED, ET AL., Appellees




 


On Appeal from the 76th Judicial District Court


Morris County, Texas


Trial Court No. 20,831




 




Before Grant and Ross, JJ.


Opinion by Justice Grant


Chief Justice Morriss not participating


O P I N I O N



 Brown & Root, Inc., n/k/a Kellogg-Brown & Root, Inc. appeals a jury verdict in favor of the
Plaintiffs-Appellees, Nancy Moore, individually and as personal representative of the heirs and estate
of Robert Moore, deceased, et al. (Moore). This was a suit for personal injury Robert Moore
suffered as a result of his exposure to asbestos. The jury found that Brown & Root was ten percent
responsible for Moore's injury and also found that Brown & Root acted with malice in proximately
causing the injury. The trial court then rendered judgment against Brown & Root awarding $166,000
in exemplary damages. Brown & Root appeals the jury's finding of malice and, therefore, the
exemplary damages awarded against them. 

 This case turns on whether there is any evidence to support the jury's finding of malice on
the part of Brown & Root which resulted in the award of exemplary damages. Brown & Root
contends that when an employer is a corporation, only the actions of the corporation's vice principals
may be attributed to the corporation.

 Robert Moore suffered from mesothelioma and eventually died from this illness January 7,
2001. Moore worked as a laborer at Lone Star Steel from 1977 to 1985. While working at Lone
Star, Moore worked around tempering furnaces that allegedly contained asbestos insulation. 
Contractors from Brown & Root tore out and installed insulation in the furnaces and pipes at Lone
Star. Moore asserted he worked in the vicinity of Brown & Root employees while they performed
this tear-out and reinstallation work on the furnaces. 

 Brown & Root contends there is no evidence supporting the jury's finding of malice and,
therefore, the award of exemplary damages was improper. When reviewing a challenge to the
factual sufficiency of an adverse finding of an issue on which it did not have the burden of proof, the
attacking party must demonstrate on appeal there is no evidence to support the adverse finding. 
Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). In reviewing a no-evidence issue, we must
consider all of the record evidence in the light most favorable to the party in whose favor the verdict
has been rendered, and every reasonable inference deducible from the evidence is to be indulged in
that party's favor. Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285-86 (Tex.
1998).

 A no-evidence point should be sustained when (1) there is a complete absence of evidence
of a vital fact, (2) the court is barred by rules or law or evidence from giving weight to the only
evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than
a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. Merrell Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). 

 Brown & Root argues there is no evidence that Brown & Root, the corporation, acted with
malice. Chapter 41 of the Texas Civil Practice & Remedies Code, which deals with exemplary
damages, defines malice as





 (7) "Malice" means:


 (A) a specific intent by the defendant to cause substantial injury to the
claimant; or 


 (B) an act or omission: 


 (i) which when viewed objectively from the standpoint of the actor at the
time of its occurrence involves an extreme degree of risk, considering the
probability and magnitude of the potential harm to others; and


 (ii) of which the actor has actual, subjective awareness of the risk involved,
but nevertheless proceeds with conscious indifference to the rights, safety, or
welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7)(B) (Vernon Supp. 2003). This definition includes
objective and subjective requirements. Objectively, the defendant's conduct must involve an extreme
risk of harm, a threshold significantly higher than the objective reasonable person test for negligence.
Celanese Ltd. v. Chem. Waste Mgmt., Inc., 75 S.W.3d 593, 599 (Tex. App.-Texarkana 2002, pet.
denied). Subjectively, the defendant must have actual awareness not just of a risk, but of an extreme
risk created by the conduct. Id. 

 The objective prong of malice requires an "extreme degree of risk," which is not a remote
possibility of injury or even a probability of minor harm, but rather the likelihood of serious injury
to the plaintiff. Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex. 2001). The
subjective prong requires "actual awareness," which means the defendant knew about the peril, but
its acts or omissions demonstrated it did not care. Id. Additionally, circumstantial evidence is
sufficient to prove either prong of malice. Id. Evidence of malice is legally sufficient if, considered
as a whole in the light most favorable to the prevailing party, it rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions. Gen. Motors Corp. v. Sanchez, 997
S.W.2d 584, 595 (Tex. 1999). 

 Brown & Root's contention concerning malice is that the appropriate officer of Brown &
Root did not have malice. For a corporation to be held liable for exemplary damages, the acts or
omissions of the corporation itself must have been committed with malice. Mobil Oil Corp. v.
Ellender, 968 S.W.2d 917, 921 (Tex. 1998). The Texas Supreme Court holds that a corporation has
acted with malice and is liable for punitive damages if (1) the corporation itself commits the acts or
omissions with malice; (2) the corporation authorized or ratified an agent's malicious acts or
omissions; (3) the corporation is malicious in hiring an unfit agent; or (4) the corporation commits
malice through the actions or inactions of a vice principal. Id. at 921-22. Vice principal
encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge
servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of
the master; and (d) those in whom the master has confided the management of the whole or a
department or a division of the business. Id. at 922. 

 The facts and the legal points raised on appeal in the present case closely resemble those in
Mobil Oil Corp. v. Ellender; thus, the facts of Ellender are useful. Id. at 922-26. Mobil Oil was
sued by Ellender for injuries sustained from continued exposure to benzene. Id. at 920. Ellender
was a millwright at Mobil's refinery from 1963 to 1977; he was continually exposed to benzene at
work. Ellender was diagnosed with leukemia and died in 1989. Id. Ellender alleged Mobil was
negligent, grossly negligent, and malicious in: (1) failing to warn Ellender about his exposure to
benzene on Mobil's premises and the risks associated with it, and (2) failing to protect Ellender from
those risks. Id. The jury found Mobil's conduct was grossly negligent and malicious. Id. The Texas
Supreme Court affirmed. Id. 

 Like Brown & Root in the present case, Mobil asserted there was no evidence to support the
jury's verdict of malice. Id. Specifically, Mobil claimed there was insufficient evidence of "an
extreme risk" to Ellender of serious injury from benzene exposure. Id. However, the court found
there was evidence Mobil failed to warn contract workers about benzene exposure or protect them
from it. Id. Moreover, from Mobil's own viewpoint, it was recognized during the time Ellender
worked at Mobil there was an extreme degree of risk associated with benzene exposure. Id. There
is also evidence Ellender's exposure to benzene was dangerously high. Id. at 923. 

 Mobil asserted there was no evidence a vice principal's conduct involved an extreme degree
of risk to Ellender. Id. However, the Texas Supreme Court did not agree. The court found there
was evidence of Mobil's own acts and omissions involved an extreme degree of risk. Id. Mobil had
an "unwritten policy" not to monitor contract workers, and Mobil did not include any reference to
benzene or other chemicals in its 1967 pamphlet titled "Mobil Safety and Security Regulations for
Contract Workers." Id. 

 Mobil also argued there was insufficient evidence a Mobil vice principal knew of the extreme
risk. Id. at 924. Mobil's medical director from 1960 to 1983 testified he knew benzene caused
diseases, including aplastic anemia. Id. Additionally, samples from conditions similar to those in
Ellender showed excessive levels of benzene exposure. Id. Mobil also had a program "designed to
protect the health of those employees who handle benzene and benzene related products," that
directed doctors and hygienists to look for benzene exposure and provide protective gear. Id. The
Texas Supreme Court found that all of this constituted legally sufficient circumstantial evidence
Mobil vice principals knew that not providing protective gear and not monitoring or warning workers
about benzene exposure was an extreme risk to contract workers like Ellender. Id. at 924-25. 

 The present case is strikingly similar to Ellender. Brown & Root asserts that no vice
principal was responsible for malice. As for the objective prong of malice, Moore produced
evidence at trial it was common knowledge in the industry as far back as 1930 that asbestos products
posed a serious health risk. There was evidence it was accepted in 1949 that asbestos could cause
lung cancer, and asbestos was linked to mesothelioma in approximately 1960. Evidence was also
produced indicating the Texas regulations passed in 1958 and 1972 OSHA regulations regarding
asbestos exposure limits. In light of this evidence, it appears there is legally sufficient evidence that
Brown & Root's conduct, viewed objectively from Brown & Root's point of view when Moore
worked there, involved an extreme degree of risk to contract workers like Moore.

 The subjective prong of malice is where Brown & Root focuses its argument. Brown & Root
argues no vice principal acted with malice. However, Brown & Root asks this court to drastically
change the requirements to find a corporation liable for malice. There are several ways a corporation
can be held liable for malice, and only one of them requires action from a vice principal. In fact, the
Texas Supreme Court clarified this, stating, "A corporation is liable for punitive damages if it
authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent." 
Ellender, 968 S.W.2d at 921. The next sentence states, "A corporation is also liable if it commits
gross negligence through the actions . . . of a vice principal." Id. at 922 (emphasis added). 
Therefore, if a corporation ratifies or authorizes one of its agent's malicious acts or if an agent is
malicious in hiring an unfit agent, there is no requirement of action or involvement of a vice
principal. Id. 

 Moore produced evidence of Brown & Root's subjective knowledge of the hazards of
asbestos. Brown & Root knew the OSHA regulations related to asbestos exposure and applied 
them, and Brown & Root distributed an office memorandum regarding the OSHA regulations. Five
years after that memorandum, Brown & Root sampled the air at ten of its work sites for asbestos
monitoring, but no monitoring of Lone Star Steel was done. The OSHA regulations required
monitoring to begin six months after the regulations were passed in 1972, and there was evidence
Brown & Root did not begin monitoring until 1976. 

 There was also evidence Brown & Root circulated an interoffice memorandum regarding air
monitoring that noted the "enormous" cost for initiating such an examination program. Additionally,
there was testimony from two witnesses that cost considerations may affect decisions related to
safety. There was expert testimony that Brown & Root was in possession of sufficient information
to be able to anticipate in 1977 that workers in industrial settings may be exposed to asbestos. 

 Moreover, Brown & Root regularly contracted with Exxon and was Exxon's largest
contractor. In 1947, Exxon began requiring its workers to wear respirators to avoid asbestos
exposure. Exxon also created a safety manual containing its rules regarding the control of asbestos
dust and the requirement that its workers wear respirators. Exxon provided a copy of this safety
manual to the supervisors of its contractors before each job. In every job that Brown & Root
performed for Exxon after 1947, Brown & Root was required to follow Exxon's safety rules to
protect its workers from asbestos exposure. In addition to the safety manuals given to Brown & Root
supervisors, there is evidence of supplemental conversations explaining the precautions that should
be taken. If Brown & Root's employees failed to wear the required respirators, Exxon would shut
down the job. This evidence concerning Brown & Root's relationship with Exxon is circumstantial
evidence tending to establish Brown & Root's subjective knowledge of the dangers of asbestos.

 Furthermore, Brown & Root's health, safety, and environmental manager, John Hodges,
testified he had the most knowledge with respect to work performed by Brown & Root at Lone Star
Steel in the 1960's, 1970's, and 1980's. Hodges was aware that in the 1960's and 1970's, some
thermal insulation products that may have been used on pipes or furnaces contained asbestos. 
Hodges testified Brown & Root was aware of the OSHA requirements related to the asbestos
exposure. Hodges also acknowledged Brown & Root had an obligation to perform its work in a safe
manner and that included protecting other workers, such as Lone Star Steel workers who could have
potentially been injured by Brown & Root's work. Finally, Hodges acknowledged that if Brown &
Root installed or disturbed insulation at Lone Star and a Lone Star employee was injured because
of the work, Brown & Root would be responsible. 

 There was also testimony from Steven Paul Sellers, who was an industrial hygiene technician
for Brown & Root from November 1976 to April 1984. When Sellers was hired at Brown & Root
in 1976, the position was new. As an industrial hygiene technician, Sellers performed a variety of
functions, including air monitoring or air sampling. Sellers received on-the-job training and went
to a formal asbestos contractor course concerning the hazards of asbestos. Sellers testified he knew
Brown & Root was involved in the removal of asbestos-containing materials around the country. 
Sellers further testified that between 1977 and 1984, it was proper for an industrial hygienist to
assume that insulation already in place was asbestos-containing unless testing had been done to
confirm otherwise. Sellers knew in 1977 that asbestos was a hazardous substance and that it was
connected to some forms of cancer. Sellers stated that insulation removal required monitoring and
application of OSHA regulations. Sellers testified he performed air monitoring related to asbestos
on a variety of occasions, but there were many Brown & Root job sites that may have contained
asbestos he was not able to cover.

 Sellers further testified asbestos fibers can stay in the air for long periods of time and can
float in a wide area. There was also testimony from Sellers recognizing that the inhalation of
asbestos fibers is hazardous. Sellers acknowledged he would be concerned if he were to observe a
tear-out of asbestos and see that no protective mechanisms were being used. Sellers admitted that
a corporation's attitude could be described as indifferent if that corporation exposed its employees
or others to hazardous substances despite knowledge of the hazard and an understanding of the
regulations. 

 Testimony from former Brown & Root employees also established evidence of Brown &
Root failing to protect the workers at Lone Star Steel. James Hubert Jones was an employee of
Brown & Root and worked at Lone Star Steel from the 1970's to 1981; during that time, he worked
as a millwright, the same position as Robert Moore. Jones testified he was never told about the
dangers of asbestos or provided with any type of instructions on how to safely work with asbestos. 
Jones testified that to his knowledge, no air monitoring was ever done at Lone Star Steel. Moreover,
Brown & Root did not teach Jones how to decrease dust while he was working at Lone Star Steel. 
Jones stated he was not provided with respiratory protection from Brown & Root when he was
working around asbestos. Jones further testified Brown & Root did not put up any signs or rope off
areas where there may have been asbestos. There was no medical monitoring performed on Jones
for asbestos-related diseases. Finally, Jones testified that during his entire career working for Brown
& Root, Brown & Root never taught him to use any type of precautions regarding asbestos. 

 Additionally, there was testimony from Harold Vaughn, an employee of Brown & Root from
1954 to 1987; during that time, he was a project manager on the job at Lone Star Steel from
approximately 1972 to 1981. Vaughn was the "top man" or the highest ranking Brown & Root
supervisor at Lone Star Steel from 1972 to 1981. Vaughn supervised anywhere from fifty to 450
Brown & Root employees at Lone Star Steel. Vaughn testified he knew in the 1960's asbestos could
cause health problems. 

 Vaughn testified Brown & Root performed no air monitoring the entire time he worked there,
and it never placed any warning signs around asbestos products at Lone Star Steel. Vaughn further
testified he did nothing at the premises of Lone Star Steel to determine if there was asbestos present
when he began working there in 1972. Vaughn did not know whether refractory castable or block
insulation from the 1950's to the 1970's contained asbestos; these were the materials Brown & Root
worked on at Lone Star Steel. Vaughn then explained he would not be able to tell from any point
in time at Lone Star Steel whether the insulation being removed contained asbestos. 

 Evidence exists regarding Brown & Root's subjective knowledge of the risks associated with
asbestos and its failure to protect its employees and the workers at Lone Star Steel from those risks. 
Unlike the facts in Louisiana-Pacific Corporation v. Andrade, here, more evidence than a mere
absence of corporate policy was raised. 19 S.W.3d 245, 248 (Tex. 1999) (Andrade was told
electricity was turned off, but when he leaned against a metal rail of a crane, he received an electric
shock that caused permanent head injuries. There was no corporate policy regarding turning off the
electricity, but under the circumstances that alone did not support an inference of Louisiana Pacific's
subjective awareness.). Moreover, the Texas Supreme Court recognized that corporate policies or
lack of them can serve as a basis for gross negligence or malice. Id. In Mobil Oil Corporation v.
Ellender, the plaintiff produced evidence Mobil had a detailed policy of monitoring, testing, and
warning its own employees to protect them from risks associated with exposure to benzene, but did
not do so for contract workers. 968 S.W.2d at 924-25. The Texas Supreme Court concluded this
policy was legally sufficient evidence Mobil knew of the extreme risks associated with benzene
exposure, and despite this knowledge had an "unwritten practice or policy" of not warning or testing
contract workers, which permitted the jury to infer Mobil knew of the risks of benzene exposure yet
proceeded with conscious indifference toward the safety of the contract workers. Id. 

 Again, the facts in the present case mirror those in Ellender. Id. at 924-25. In Ellender, the
Texas Supreme Court found that evidence of knowledge of a dangerous risk coupled with not
providing protective gear or warning workers was legally sufficient evidence that the vice principals
engaged in malice. Id. at 925. Here, similar evidence exists to support the jury's finding Brown &
Root acted with malice. Brown & Root, when contracting with Exxon, proceeded with extreme
caution and protected workers possibly coming in contact with asbestos; however, Brown & Root
did not use these safety policies while working at Lone Star Steel. 

 The testimony from Brown & Root's health, safety, and environmental manager, Hodges,
indicated he was in the position to know the most about potential asbestos-contaminated work sites,
and he knew thermal insulation like that at Lone Star Steel could contain asbestos. There is further
evidence that despite Brown & Root's knowledge that asbestos could likely be in the pipes and
furnaces at Lone Star Steel, there was no monitoring or testing done to determine if in fact asbestos
was present, nor were any precautions taken such as warnings or distributing protective gear. 

 The circumstantial evidence substantiates that Brown & Root vice principals knew of the
risks concerning asbestos exposure, but still did nothing to warn or protect the workers at Lone Star
Steel. Evidence was also introduced that Vaughn, who was the Brown & Root supervisor at Lone
Star Steel, satisfies the requirements of a vice principal. Vaughn had the authority to direct Brown
& Root employees at Lone Star Steel, and Brown & Root confided in him to manage the entire
Brown & Root operation at Lone Star Steel. See Hammerly Oaks v. Edwards, 958 S.W.2d 387, 391
(Tex. 1997). This evidence was sufficient for the jury to find malice on the part of Brown & Root
through the actions of Vaughn, a vice principal. The jury could also have reasonably inferred that
Brown & Root, the corporation, acted with malice. Specifically, evidence was raised that Brown &
Root had subjective knowledge of the risks associated with asbestos but acted with conscious
indifference to the rights of the workers at Lone Star Steel.

 Having reviewed the evidence in a light most favorable to the jury's finding to determine if
Brown & Root had actual, subjective awareness of the risk involved, but nevertheless proceeded with
conscious indifference to the rights, safety, or welfare of others, we find the evidence was legally
sufficient to support the jury's finding of malice. Thus, Brown & Root's point of error is overruled.

 The judgment of the trial court is affirmed.




 Ben Z. Grant

 Justice


Date Submitted: November 7, 2002

Date Decided: December 11, 2002


Publish



sible;mso-wrap-style:square'>
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00065-CR

                                                ______________________________

 

 

                                BILLY CARLON HATHORN,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 159th
Judicial District Court

                                                           Angelina County, Texas

                                                            Trial
Court No. 28,904

 

                                                      
                                            

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                     MEMORANDUM 
OPINION

 

            Having
pled guilty to one count of aggravated sexual assault of a child and no contest
to two counts of indecency with a child, Billy Carlon Hathorn stood before the
trial court in Angelina County[1]
for punishment to be assessed.  After
Hathorns trial counsel objected to parts of the presentence investigation
(PSI) report, the court sustained the objection and expressly stated it would
not consider the objected-to portions of the report.  The trial court sentenced Hathorn to
thirty-five years imprisonment for the aggravated sexual assault and to
fifteen years for each count of indecency.  The sentences for indecency were to be served
concurrently as to each other, but consecutively as to the sentence for
aggravated assaulteffectively, fifty years total confinement.

            On
appeal, Hathorn argues that the trial court erred in ordering the indecency
sentences to be served consecutively to the aggravated-assault sentence and
that his trial counsel was ineffective in failing to move to recuse the trial
judge or to allow Hathorn to review the PSI report.

            We
affirm the trial courts judgment because:  (1) Hathorn failed to preserve his objection
to his sentencing, (2) trial counsels decision not to seek recusal was not
unreasonable, and (3) there is insufficient evidence that Hathorn failed
to review the PSI report.

(1)        Hathorn
Failed to Preserve His Objection to His Sentencing

            Hathorn argues that the trial courts
ordering the indecency sentences to be served consecutively after the
aggravated assault sentence is excessive, cruel, and unusual punishment. 

            To
preserve such complaint for appellate review, Smith must have presented to the
trial court a timely request, objection, or motion that stated the specific
grounds for the desired ruling, or the complaint must be apparent from the
context.  See Tex. R. App. P.
33.1(a)(1); Harrison v. State, 187
S.W.3d 429, 433 (Tex. Crim. App. 2005); Williams
v. State, 191 S.W.3d 242, 262 (Tex. App.Austin 2006, no pet.) (claims of
cruel and unusual punishment must be presented in timely manner); Nicholas v. State, 56 S.W.3d 760, 768
(Tex. App.Houston [14th Dist.] 2001, pet. refd) (failure to complain to
trial court that sentences were cruel and unusual waived claim of error for
appellate review). 

            We
have reviewed the records of the trial proceeding.  No relevant request, objection, or motion was
made.  And, while this Court has held
that a motion for new trial is an appropriate way to preserve this type of
claim for review (see Williamson v. State,
175 S.W.3d 522, 52324 (Tex. App.Texarkana 2005, no pet.), and Delacruz v. State, 167 S.W.3d 904 (Tex.
App.Texarkana 2005, no pet.)), no motion for new trial was filed.  Hathorn has not preserved this issue for
appeal.

(2)        Trial
Counsels Decision Not to Seek Recusal Was Not Unreasonable

            Ineffective assistance of counsel
claims are evaluated under the two-part test formulated by the United States
Supreme Court in Strickland v. Washington,
requiring a showing of both deficient performance and prejudice.  466 U.S. 668, 689 (1984); Thompson v. State, 9 S.W.3d 808, 812
(Tex. Crim. App. 1999); Fox v. State,
175 S.W.3d 475, 485 (Tex. App.Texarkana 2005, pet. refd).  First, Hathorn must show that his counsels
representation fell below an objective standard of reasonableness.[2]  Fox,
175 S.W.3d at 485 (citing Tong v. State,
25 S.W.3d 707, 712 (Tex. Crim. App. 2000)). 
We indulge a strong presumption that counsels conduct falls within the
wide range of reasonable, professional assistance, and was motivated by sound
trial strategy.  See Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).  The second Strickland
prong requires a showing that the deficient performance prejudiced the defense
to the degree that there is a reasonable probability that, but for the attorneys
deficiency, the result of the trial would have been different.  Strickland,
466 U.S. at 689; Tong, 25 S.W.3d at
712.  Failure to satisfy either prong of
the Strickland test is fatal.  Ex parte
Martinez, 195 S.W.3d 713, 730 (Tex. Crim. App. 2006).  

            A
Strickland claim must be firmly
founded in the record and the record must affirmatively demonstrate the
meritorious nature of the claim.[3]  Goodspeed
v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); Thompson, 9 S.W.3d at 813. 
Under this standard, a claimant must prove that counsels representation
so undermined the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result.  Strickland,
466 U.S. at 686.

            During
the punishment hearing, Hathorn objected to attachments 6 and 7 and pages 24
of the PSI report on the grounds that they included unadjudicated and unproven extraneous
offenses, that they included information in violation of the confrontation
clause, and that they were improperly included without permission from the
jurisdiction of the extraneous offenses. 
The State argued that the trial court could consider the extraneous
unadjudicated offenses referenced in the PSI report for punishment purposes
even though they amount to hearsay and no permission had been obtained.

            The
trial court pointed out that it had already read the PSI report and asked
Hathorns trial counsel whether he had any recusal concerns if the court were
to sustain his objections.  When deciding
whether to move for recusal, trial counsel stated:

And the question is whether I -- Im thinking out
loud, to some extent.  The question would
be whether this is a matter of such gravity that it would be difficult, if not
impossible, for the Court to not consider these matters in assessing
punishment.  And I dont know any way to
answer that other than I think that there is always that potential danger.  I know the Court.  Ive always found the Court to be extremely
fair and able to consider matters, but I guess that would be the best way.  Im not moving to recuse the Court. 

 

The court sustained Hathorns
objections, took judicial notice of those portions of the PSI report that were
not objected to, and held that it would not hear any more concerning whatever
would be the subject matter of Attachment[s] 6 and 7, pages 2 through 4 of the
report.

            Here,
we find trial counsels belief in the fairness and integrity of the trial judge
to be a reasonable and sound trial strategy. 
We review trial counsels conduct with great deference, without the
distorting effects of hindsight.  Thompson, 9 S.W.3d at 813.  Therefore, Hathorn has failed to prove
deficient performance, as is required by the first prong of Strickland.  Accordingly, we overrule this point of error.

(3)        There Is Insufficient
Evidence that Hathorn Failed to Review the PSI Report

            Hathorn
argues that his counsel was ineffective by not allowing him to review the PSI.


            Here,
Hathorn points out that there is no evidence in the record indicating that he reviewed
the PSI report.  On the other hand,
nothing in the record affirmatively demonstrates that Hathorn failed to review
the report, let alone that his trial counsel prevented him from doing so.  When facing a silent record, we will not
speculate as to counsels tactics or reasons for taking or not taking certain
actions.  See Mata v. State, 226
S.W.3d 425, 431 (Tex. Crim. App. 2007); see
also Thompson, 9 S.W.3d at 814 (if record is silent as to reasons for
attorneys particular course of action, we are compelled to find that defendant
did not rebut the presumption).  When
faced with such a silent record and in the lack of anything that would indicate
such completely ineffective assistance as could be shown without such a record,
we overrule the point of error.

            We affirm the trial courts
judgment.

 

 

 

                                                                        Josh
R. Morriss, III

                                                                        Chief
Justice

 

Date Submitted:          July 15, 2010

Date
Decided:             July 30, 2010

Do Not
Publish











[1]Originally
appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization
efforts.  See Tex. Govt Code Ann.
§ 73.001 (Vernon 2005).  We are unaware
of any conflict between precedent of the Twelfth Court of Appeals and that of
this Court on any relevant issue.  See Tex.
R. App. P. 41.3.





[2]The
presumptions and standards of proof of Strickland
apply to the punishment phase as well as to the trial stage of criminal
proceedings.  Wiggins v. Smith, 539 U.S. 510 (2003); Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

 





[3]Under
normal circumstances, the record on direct appeal will not be sufficient to
show that counsels representation was so deficient and so lacking in tactical
or strategic decision-making as to overcome the presumption that counsels
conduct was reasonable and professional. 
Mallett v. State,
65 S.W.3d 59, 63 (Tex. Crim. App. 2001); Fuller
v. State, 224 S.W.3d 823, 82829 (Tex. App.Texarkana 2007, no pet.).  In addressing this reality, the Texas Court of
Criminal Appeals has explained that appellate courts can rarely decide the
issue of ineffective assistance of counsel because the record almost never
speaks to the strategic reasons that trial counsel may have considered.  The proper procedure for raising this claim
is therefore almost always habeas corpus. 
Freeman v. State,
125 S.W.3d 505, 506 (Tex. Crim. App. 2003); Aldrich v. State, 104 S.W.3d 890, 896 (Tex. Crim.
App. 2003).